UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-60013-CV-BLOOM
MAGISTRATE JUDGE REID

RODRICK JOHNSON,

     Petitioner,

v.

MARK INCH,

     Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I. Introduction

This Cause is before the Court upon Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his conviction and sentence for robbery with a firearm, following a jury trial in case no. 09-1224CF10A in the state circuit court in and for Broward County, Florida. [ECF 1]. For the reasons detailed below, the Petition should be denied.

This Cause has been referred to the Undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B), (C); S.D. Fla. Local Rule 1(f) governing Magistrate Judges; S.D. Fla. Admin. Order 2019-02; and the Rules Governing Habeas Corpus Petitions in the United States District Courts.

## II. Claims

Construing the arguments liberally, as afforded to *pro se* litigants pursuant to

*Haines v. Kerner*, 404 U.S. 519, 520 (1972), Petitioner raised the following claims:

> 1. Petitioner was deprived of his right to self-representation;
>
> 2. Ineffective assistance of counsel for failing to advise Petitioner on certain considerations before declining a plea offer;
>
> 3. Ineffective assistance of counsel for failing to call an exculpatory witness;
>
> 4. Ineffective assistance of counsel for inadequately cross-examining the victim on matters relating to his identification of Petitioner.

[ECF 1].

## III. Factual and Procedural Background

A. <u>Factual Matters Adduced at Trial</u>

On January 21, 2009, at about 5:30 a.m., Mr. Benjamin Soto, who worked as a sushi chef at the Marriott Hollywood Beach Hotel, arrived at work. [ECF 16-1, pp. 239-42]. He drove a 2001 Nissan Maxima. [*Id.* p. 242]. According to Mr. Soto, it was "pretty dark out." [*Id.* pp. 242-43].

While parked in his vehicle, Mr. Soto heard tapping on the driver's side window. [*Id.* pp. 243-44]. Mr. Soto looked in that direction and saw a chrome colored, semi-automatic pistol pointed at his face. Mr. Soto described the gunman

as a black male with long dreads extending "beneath his shoulder." [*Id.* pp. 244-45]. The gunman, who wore a jacket and a black t-shirt, said, "give me everything." [*Id.*].

A second individual opened Mr. Sato's front passenger side door and sat in the seat next to Mr. Sato. [*Id.* pp. 245-46]. The second individual had a black semi-automatic pistol. [*Id.*]. Mr. Sato described the second gunman as a black male with "twisties" in his hair. [*Id.* pp. 246-47]. The second gunman had a lighter complexion than the first. [*Id.*]. As Mr. Sato testified, he was so close to the second gunman he could touch him and nothing obstructed this person's face. [*Id.*]. During the incident, the interior car lights were on. [*Id.* p. 246]. Mr. Sato also confirmed that he could clearly see the faces of both gunmen. [*Id.* p. 248].

Mr. Sato stated he was more focused on the second gunman. [*Id.* p. 261]. Although Mr. Sato tried to exit his vehicle, the gunmen poked Mr. Sato's head with their firearms and warned him that they would shoot if he tried to leave. [*Id.* p. 248].

Soon after the two gunmen left Mr. Sato's car, taking his car keys, a gray mini-van arrived, and the two gunmen jumped into the minivan's passenger seats and sped away. [*Id.* pp. 248-49]. Mr. Sato did not see a third person. [*Id.* p. 249]. Mr. Sato ran out into the road trying to memorize the minivan's tag number and immediately called the police. [*Id.* pp. 249-50].

Within five minutes, law enforcement from the Hollywood Police Department arrived, and Mr. Sato relayed the events of the robbery to Officer Mitchell Case. [*Id.* pp. 250, 281]. He provided a description of the two gunmen and the tag number. [*Id.* pp. 250, 264-65, 281]. Officer Case radioed the description to other officers on patrol. [*Id.* p. 282].

Officer Ronald Canella heard the broadcast describing the suspected vehicle's make and model, a Dodge Caravan, and the first four numbers of the tag. [*Id.* p. 311]. Officer Canella drove his marked police cruiser to perimeter an area four to five miles from where the incident transpired. [*Id.* pp. 311-12]. Officer Canella saw a Dodge Caravan, which appeared to him to be light blue in color, travelling toward the interstate. [*Id.*]. He followed the vehicle. [*Id.* p. 312]. The van cut across three lanes of traffic to enter the northbound I-95 ramp. [*Id.* p. 313]. Officer Canella, with his police lights and sirens activated, pursued the minivan and radioed his location. [*Id.*]. The minivan accelerated quickly and began changing lines in an abrupt fashion. [*Id.*]. To keep up with the minivan, Officer Canella drove his vehicle as fast as 110 miles per hour. [*Id.* pp. 313-14]. The van exited on Broward Boulevard and drove westbound. [*Id.*].

Although Officer Canella temporarily lost sight of the vehicle for about 15 seconds [ECF 16-1, p. 314], other police vehicles continued the pursuit. [*Id.* pp. 273-74, 292-93, 304, 314]. Ultimately, the van crashed into a concrete median near the

intersection of Broward Blvd and N.W. 31st Avenue, about 10 miles away from the robbery. [*Id.* pp. 274-75, 293-94, 304, 315]. After the vehicle crashed, according to the testimony of the officers on duty, three men exited the vehicle and fled on foot. [*Id.* pp. 275, 294-95, 304, 315-16].

The minivan's driver was apprehended almost immediately. [*Id.* pp. 294-95]. Officer Schuller chased another man on foot, caught him behind a convenience store, and arrested him. [*Id.* pp. 275-77]. This person was later identified as Petitioner [*Id.* pp. 277-78]. Officers Canella and Hughes caught Codefendant Wright and arrested him. [*Id.* pp. 305-07, 315-19].

Mr. Sato was brought to the area of the crash for a show-up. [*Id.* p. 283]. He was told he must be positive that the persons they were about to show were the robbers and to state whether he was unsure if they were the robbers. [*Id.* p. 283]. Both Officer Case and Mr. Sato confirmed this was the instruction given to Mr. Sato. [*Id.* pp. 283, 251]. Officer Case admitted that he told Mr. Sato that the suspects who robbed him were being detained prior to the show-up procedure. [*Id.* pp. 262, 288-89].

When Mr. Sato arrived at the crash area, he identified the minivan as the getaway vehicle. [*Id.* pp. 251-52, 288-89]. During the show-up procedure, Mr. Sato identified two of the three persons presented to him. [*Id.* p. 253]. The first person shown was Codefendant Derrick Wright, who Mr. Sato identified as one of the

robbers. [*Id.* pp. 284-86]. Mr. Sato could not identify the second person shown to him, who was Codefendant Jessie Bentley. The third person presented was Petitioner, who Mr. Sato identified as one of the two robbers. [*Id.* pp. 286-87]. On cross-examination, Mr. Sato admitted that he received little sleep before the incident, that the suspects emerged from marked police cars when he identified them on the scene, and that he did not see the suspects up close during the identification. [*Id.* pp. 257-58, 262-64].

Police searched the van, which yielded a set of keys belonging to Mr. Sato. [*Id.* pp. 256, 296-97]. The search never produced any firearms. At trial, Mr. Sato identified both Petitioner and Codefendant Wright as the individuals who robbed him. He maintained that he was 100% certain when he initially identified them as the robbers. [*Id.* pp. 254-55]. Mr. Sato also confirmed the set of keys found were the same set of keys he had surrendered to the robbers. [*Id.* pp. 255-56, 296-97].

Petitioner's codefendant, Wright, testified at trial. According to Wright's testimony, Codefendant Bentley came in a van to pick him up so that he could look for a job and to drop off Petitioner at his job. [*Id.* pp. 333-34]. Wright had to be somewhere at 8:00 a.m., and Petitioner had to be at work by 9:00 a.m. [*Id.* pp. 341-42]. Bentley arrived to pick them up at approximately 5:30 a.m. [*Id.* p. 347]. According to Wright, when law enforcement vehicles began to pursue them, Bentley claimed that he was driving a stolen vehicle. [*Id.* pp. 334-35, 350]. Wright allegedly

6

fled on foot fearing "the reputation of Hollywood police." [*Id.*]. Wright denied involvement in the robbery. [*Id.* p. 335-36]. Petitioner did not testify. [*Id.* p. 355].

B. Procedural Background

Petitioner, along with Derrick Wright and Jessie Bentley, was charged by Information with robbery with a firearm. [ECF 13-1, pp. 7-9]. Petitioner and Wright were tried together without Bentley.

The jury found Petitioner guilty of robbery with a firearm and further found that Petitioner possessed a firearm during the robbery. [ECF 13-1, p. 23]. The trial court designated Petitioner as a habitual felony offender. [ECF 17-1, p. 46]. Petitioner was then sentenced to 30 years' imprisonment with a 10-year mandatory minimum. [ECF 13-1, pp. 25-34].

Petitioner appealed. [*Id.* pp. 36-38]. After examining the record on appeal, Petitioner's appellate attorney filed an *Anders*[1] brief and moved to withdraw finding "no meritorious grounds on which to argue the trial court committed reversible error." [*Id.* pp. 50-57]. Petitioner filed a *pro se* appellate brief arguing that the trial court had coerced him into declining the opportunity to represent himself at trial. [ECF 13-1, pp. 61-79]. On April 18, 2012, Florida's Fourth District Court of Appeal granted appellate counsel's motion to withdraw and affirmed the judgment in an unreasoned opinion. [*Id.* pp. 100, 102].

---

[1] *Anders v. California*, 386 U.S. 738 (1967).

On March 21, 2013, Petitioner filed *pro se* initial motion to vacate pursuant to Fla. R. Crim P. 3.850. [ECF 13-1, pp 106-14]. An amended version was filed on May 15, 2013. [ECF 13-1, pp. 116-24]. Another amended version was filed on January 14, 2014. [ECF 13-1, pp. 125-36]. Petitioner's fourth amended version was filed on March 10, 2015. [ECF 13-1, pp. 138-80]. Ultimately, Petitioner's fifth and final amended motion to vacate with exhibits was filed on November 12, 2015. [ECF 13-1, pp. 182-234]. In that final version of his motion to vacate, which incorporated all of Petitioner's previously presented claims, Petitioner raised the following grounds for relief:

> (1) trial counsel was ineffective for allowing Petitioner to be tried and convicted on charges arising from an Information that was not supported by sworn testimony;
>
> (2) trial counsel was ineffective for failing to advise Petitioner of the direct consequences of being designated a habitual felony offender;
>
> (3) Petitioner's designation as a habitual felony offender was illegal because one of the predicate felonies used in the designation was found to be unconstitutional;
>
> (4) trial counsel was ineffective for failing to specifically question four selected jurors as to whether they could be impartial;
>
> (5) trial counsel was ineffective for failing to file a motion to suppress the out-of-court identification from the show-up procedure;
>
> (6) trial counsel was ineffective for failing to investigate a possible witness to the crime;

(7) trial counsel was ineffective for failing to properly cross-examine the victim;

(8) trial counsel was ineffective for failing to present a sufficient motion for judgment of acquittal; and

(9) trial counsel was ineffective for failing to object to an inadmissible statement made by the victim during cross-examination.

[*Id.*].

On February 27, 2017, the trial court denied all of Petitioner's claims, reasoning claims 1-2 and 4-9 did not "demonstrate both deficiency of counsel and prejudice" as required under *Strickland* and further finding claim 3 was meritless. [ECF 13-2, pp. 2-5]. Petitioner filed a timely notice of appeal. [ECF 13-2, pp. 7-8].

On appeal, Petitioner argued the trial court erred by summarily denying his motion for postconviction relief with respect to claims 2, 5, 6, 7, 8, and 9. [ECF 13-2, pp. 15-40]. Thus, he abandoned his remaining claims. Florida's Fourth District Court of Appeal affirmed the denial of Petitioner's motion to vacate on June 29, 2017, without issuing a written opinion. [ECF 13-2, p. 78]. The mandate issued on September 22, 2017. [ECF 13-2, p. 80]. The instant Petition was then filed on December 27, 2017. [ECF 1].

## IV. Timeliness

Stated broadly, an application for a writ of habeas corpus under 28 U.S.C. § 2254 must be filed before a 1-year time limitations period expires, and this limitation period usually runs from the date the challenged judgment became "final." 28 U.S.C.

9

§ 2244(d). In this case, the parties do not dispute timeliness of the Petition, and the Undersigned has verified the timeliness of this action. As such, the Petition is timely.

## V. Exhaustion

Pursuant to 28 U.S.C. 2254(b)-(c), petitioners must exhaust their claims before presenting them in a federal habeas petition. When petitioners do not properly present their claims to a state court by exhausting those claims and complying with the applicable state procedure, § 2254 may bar federal review of those claims in federal court. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (relying upon 28 U.S.C. § 2254(b)-(c)). In this case, the parties do not dispute the exhaustion of the claims presented in the Petition. A review of the state court record confirms that the claims have been exhausted.

## VI. Standard of Review

This Court's review of Petitioner's claim is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996). *See Abdul–Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F. 3d 600, 642 (11th Cir. 2016) (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)) (quotation marks omitted)). This purpose, and by implication AEDPA, is

consistent with the foundational principle of our federalist system of government: "State courts are adequate forums for the vindication of federal rights." *See Burt v. Titlow*, 571 U.S. 12, 20 (2013).

Several limits exist on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The most restrictive limit is that found in § 2254(d). As amended by the AEDPA, pursuant to § 2254(d), a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits of the issue was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). AEDPA's deferential standard under § 2254(d) applies only when state court proceedings adjudicated a claim on the merits. *See Cullen*, 563 U.S. at 181. "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" *Burt*, 571 U.S. at 20 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

To qualify as an adjudication on the merits, very little is required. In fact, federal courts should presume that § 2254(d)'s deference applies. *See, e.g.*, *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Even where there was a summary denial and no reasons for the denial of relief were articulated by the state trial court, such a ruling is also presumed to be an adjudication on the merits. *Id.* at 100. *See also Gill v. Mecusker*, 633 F. 3d 1272, 1288-89 (11th Cir. 2011) (acknowledging the well-settled principle that summary affirmances are presumed adjudicated on the merits and warrant deference).

"The presumption [in favor of a merits ruling existing] may be overcome" only "when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100 (relying upon *Ylst v. Nunnemarker*, 501 U.S. 797, 803 (1991).

Recently, in *Wilson v. Sellers*, 138 S. Ct. 1188, 1192-94 (2018), the Supreme Court held there is a "look through" presumption in federal habeas corpus law, as silence implies consent. This means federal courts should rely upon the "last related state-court decision" that provides a relevant rationale when the highest state court's adjudication on the merits of a claim is unaccompanied by an explanation. Put into practice, *Wilson* clarifies which state court's reasoning is presumptively afforded § 2254(d)'s deference.

12

Federal courts must presume that factual determinations made by a state court are correct. *Morrow v. Warden*, 886 F. 3d 1138, 1147 (11th Cir. 2018) (relying upon § 2254(e)). A habeas petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. *Morrow*, 886 F. 3d at 1147 (relying upon § 2254(e)).

When it is unclear or less efficient to resolve whether § 2254(d)'s additional restriction applies, federal courts may also deny writs of habeas corpus under § 2254 by engaging in *de novo* review, a more favorable standard, as a habeas petitioner would surely not be entitled to a writ under § 2254(d) if their claim would fail under *de novo* review. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109-10 (11th Cir. 2012).

## VIII. Discussion

### A. Generally Applicable Substantive Law

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate both (1) that his counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An ineffective assistance of counsel claim may be raised with respect to errors made by trial counsel or direct appeal counsel, and both are governed by *Strickland*. *See, e.g.*, *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016).

The deficiency prong is met if no competent counsel would have taken the action that trial counsel took during the proceedings. *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). The prejudice prong is met if, but for counsel's deficient performance, the outcome of the proceeding would have been favorable. *Strickland*, 466 U.S. at 694. And yet, the error must also be "so serious" that the error "deprive[d] the defendant of a fair trial, a trial whose result is reliable[,]" in order to satisfy the prejudice prong. *Strickland*, 466 U.S. at 687.

B. The Trial Court's *Faretta* Inquiry

Liberally construed, in Ground One, Petitioner contends the state trial court applied *Faretta v. California*, 422 U.S. 806 (1975) in a manner that was contrary to or an unreasonable application of clearly established federal law, resulting in him

being deprived of his right to self-representation. [ECF 1, p. 6]. In his view, the trial court erroneously conducted a *Nelson* hearing, not a *Faretta* hearing.

In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized that the Constitution contains a right to *self*-representation for criminal defendants seeking to proceed to trial without an attorney. *See Faretta*, 422 U.S. at 818, 832-33. Of course, in order to represent oneself, a defendant must knowingly and intelligently waive the benefits typically associated with the right to counsel. *Id.* at 835.

While defendants do not need the skill and experience of a lawyer in order to competently and intelligently choose self-representation, defendants "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835.  To invoke one's right of self-representation, the invocation must be "clearly and unequivocally, understandable to the trial court by the reasonable person standard." *See Stano v. Dugger*, 921 F.2d 1125, 1144 (11th Cir. 1991).

In *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973), Florida's Fourth District Court of Appeal held trial courts may inquire of indigent defendants whether they wish to discharge their court-appointed trial attorneys who operate incompetently during trial proceedings. *Glover v. State*, 226 So. 3d 795, 807 (Fla.

2017) (discussing *Nelson* hearings). *See also Hardwick v. State*, 521 So. 2d 1071, 1074-75 (Fla. 1988) (approving and adopting *Nelson* hearings). Defendants must articulate a specific complaint before a *Nelson* hearing is required, as generalized complaints will not do. *Guardado v. State*, 965 So. 2d 108, 113 (Fla. 2007).

In contrast to *Nelson*, which evaluates whether court-appointed counsel is competently representing their client during criminal proceedings in Florida's state courts, the Supreme Court's decision in *Faretta* concerns a defendant's right to self-representation. *See Faretta*, 422 U.S. at 818, 832-33.

As previously mentioned, to invoke one's right of self-representation, the invocation must be "clearly and unequivocally, understandable to the trial court by the reasonable person standard." *See Stano*, 921 F.2d at 1144. Thus, if the request to discharge counsel and proceed self-represented is somehow equivocal, the *Faretta* inquiry should stop and the opportunity to proceed without counsel should be denied. *See Gill v. Mecusker*, 633 F.3d 1272, 1293-94, 1296 (11th Cir. 2011).

On April 9, 2010, the trial court informed Petitioner that it would first conduct a *Nelson* inquiry to evaluate trial counsel's performance, and, if satisfied with counsel's performance, Petitioner would be afforded two options: hire his own counsel or self-representation. [ECF 15-1, p. 2]. The trial court found no incompetence on counsel's part [*Id.* p. 12]. Next, the trial court to inquired whether Petitioner wished to proceed with appointed counsel, hire his own attorney, or

16

proceed self-represented. [*Id.* pp. 12-15]. Ultimately, however, Petitioner stated he wanted to represent himself. [*Id.* p. 15].

A *Faretta* inquiry commenced. [*Id.*]. The trial court asked Petitioner about his educational background, whether he was literate, and warned him that the Court had authority to impose a life sentence. [*Id.* p. 15-16]. The trial court, consistent with its constitutional obligation to alert Petitioner of the dangers of self-representation, also asked Petitioner how he might select a jury or question witnesses. [*Id.* p. 17]. Petitioner said he would "take a chance" over placing his life "in somebody else's hand[s]." [*Id.*]. The trial court stressed the importance of having an experienced attorney and stated: "the person that represents himself has a fool for a client." [*Id.*]. While reminding Petitioner that he faced a risk of life in prison, the trial court asked Petitioner whether he had any experience with legal research, questioning witnesses, or had seen a trial conducted on television. [*Id.* pp. 17-18]. To every question, Petitioner expressed that he did not know how to do those things. [*Id.*]. Notwithstanding, Petitioner said he would "do something" and that he would "think of something." [*Id.* p. 18].

The trial court responded, "Such as? *I'm trying to find out, you know, are you sure about this decision*?" [*Id.* pp. 18-19] (emphasis added). Petitioner replied, "I absolutely… I don't even know no more, (sic) I don't even know." [*Id.* p. 19]. As a

result, the trial court treated Petitioner's statements as an "equivocal request" of the right to self-representation.

His final statements to the trial court conveyed he was not unsure whether to proceed without the assistance of an attorney. Therefore, even under *de novo* review, Petitioner cannot show he was deprived of his right to represent himself.

In his Reply, Petitioner characterized the statements by the trial court as "scare tactic[s]" designed to dissuade him from his original request to represent himself. [ECF 20, pp. 8-9]. But, alerting a defendant on the dangers of proceeding without counsel is not a "scare tactic," it is a court's constitutional obligation. *See Faretta*, 422 U.S. at 835 (requiring courts to alert defendants of the dangers of proceeding without counsel with their eyes open). Granted, *Faretta* does not permit courts to deny the right to self-representation merely because a defendant lacks legal experience, which the trial court did not do. At the same time, *Faretta* mandates courts to alert defendants of the perils of trial to be sure that a defendant knowingly and intelligently waived their right to counsel. *Gill*, 633 F.3d at 1293. Thus, because the right to self-representation does not include a right to abuse the dignity of the courtroom, to avoid compliance with relevant rules of procedure or substantive law, or to engage in obstructionist misconduct, *see Faretta*, 422 U.S. at 834-35 n. 46, the trial court merely warned Petitioner of the inevitable dangers of self-representation. See *Gill*, 633 F.3d at 1293.

18

In sum, because Petitioner expressed some uncertainty about his decision, and the fact that his final statements to the state trial court were equivocal, the trial court's determination was correct. Based on the fact that the trial court's determination was clearly correct, this claim could be denied even under the more favorable *de novo* review. *See Hittson*, 759 F.3d at 1248. Therefore, the Court need not address whether Petitioner can satisfy § 2254(d), as this claim should be denied.

B. <u>Ineffective Assistance Regarding a Plea Offer</u>

In Ground Two, after reviewing the claim liberally, Petitioner contends trial counsel was ineffective for failing to advise him of the direct consequences of being designated a habitual felony offender if he proceeded to trial. He claims he declined a favorable plea deal. [ECF 1, p. 8]; [ECF 12, pp. 23-24]. In Florida, state courts have discretion to extend a term of imprisonment for persons designated as habitual felony offenders. Fla. Stat. § 775.084(1)(a), (4)(a). If defendants are sentenced as habitual offenders, they are not entitled to gain-time. Fla. Stat. § 775.084(4)(e). Petitioner asserts, had trial counsel advised him adequately, he would have accepted a 12-year sentence with a 10-year minimum mandatory provision. [ECF 1, p. 8].

According to Respondent, this claim is belied by the record. [ECF 12, p. 24]. The Undersigned agrees. On April 9, 2010, one month before trial, the trial court told Petitioner he risked exposure to a life sentence by proceeding to trial. [ECF 15-1, p. 16]. In fact, the trial court told Petitioner he was a "career criminal and there

19

may be some minimum mandatories involved[.]" [*Id.*]. On the day the verdict was received, trial counsel stated he had held "numerous conversations" with Petitioner on the habitual felony offender sentencing enhancement. [ECF 16-1, p. 429]. Thus, there is record evidence that Petitioner was informed of the risks of proceeding to trial, including on the subject of the habitual felony offender enhancement. More importantly, the record shows Petitioner rejected the plea deal on May 3, 2010 [ECF 16-1, pp. 4-5], one month after the Court informed him of the risk of a life sentence and his career criminal offender status. [ECF 15-1, p. 16].

At sentencing, Petitioner denied involvement in the robbery and insisted he was innocent. [ECF 17-1, pp. 29-30] (stating he had two jobs, did not need a plastic watch, or a new car as evidence he did not rob the victim), [*Id.* pp. 34-35] (asserting he was in the "wrong place at the wrong time" and that somebody else committed the crimes).

The *Strickland* standard applies to ineffective assistance of counsel claims arising out of the plea process, including to the negotiation and consideration of pleas that are rejected or lapse. *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014). Thus, trial counsel has an obligation to inform their client about formal plea offers presented by the government. *See Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012). The failure to advise a client about such an offer is ineffective assistance of counsel. *See id*.

If a plea offer is rejected, the prejudice prong is met if there is "a reasonable probability that but for counsel's ineffectiveness: 'the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)'; (2) 'the court would have accepted its terms'; and (3) 'the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.' " *Osley*, 751 F.3d at 1222 (quoting *Lafler*, 566 U.S. at 164).

Thus, even under *de novo* review, this claim could be denied. Here, the record does not support a reasonable probability that Petitioner would have accepted the plea deal with more information. *See Lafler*, 566 U.S. at 164. Petitioner knew the risks associated with a plea deal and proceeded to trial. His statements emphasizing his innocence at sentencing further demonstrate that there is no reasonable probability Petitioner would have taken the plea deal when it was available. Petitioner's after the fact assertions concerning his desire to plead guilty is not enough to prove that he would have accepted a plea offer. *See, e.g.*, *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991). Accordingly, because this claim could be denied under *de novo* review, Petitioner certainly cannot meet the more deferential standard set forth in § 2254(d).

C. Ineffective Assistance Regarding Exculpatory Testimonial Evidence

In Ground Three, Petitioner contends his trial counsel was ineffective for failing to investigate and put forward exculpatory testimonial evidence. [ECF 1, p. 10].

In the state postconviction proceedings, Petitioner relied upon the victim's deposition, in which the victim testified to observing a Jamaican woman, possibly named Yvette, walk by the area where the incident transpired. [ECF 13-1, pp. 223-24]. The Jamaican woman told the victim, according to the victim's deposition, that she saw the driver who allegedly yelled at her to go inside but left because she thought the victim was with his friends. [ECF 13-1, p. 225]. The victim stated the Jamaican woman worked in the kitchen at the Marriott and had short hair. [ECF 13-1, p. 224]. Liberally construing Petitioner's claim, he argues that, had his attorney located the Jamaican woman, she would have testified that Petitioner was not the person she saw at the scene of the crime.

This claim was raised in Petitioner's final amended motion to vacate. [ECF 13-1, p. 193]. The state trial court denied the claim by adopting and incorporating the legal reasoning contained in the State's Response concluding that Petitioner had failed to meet either prong of the *Strickland* standard. [ECF 13-2, pp. 2-4]. The claim was raised on appeal. [ECF 13-2, pp. 28-32]. Florida's Fourth District Court of Appeal affirmed in a *per curiam*, unreasoned opinion. [ECF 13-2, p. 78]. Presumptively, therefore, this claim is subject to § 2254(d)'s deferential standard of

review. *See Richter*, 562 U.S. at 99-100. Because the last reasoned decision incorporated and adopted the state's legal reasoning to conclude Petitioner did not meet either prong of *Strickland*, the State's reasoning at the state trial court level is presumably the basis for the state appellate court's affirmance. *See Wilson*, 138 S. Ct. at 1192-94.

Essentially, the State provided two arguments on this claim. First, it reasoned that trial counsel likely declined to pursue this lead based on a strategic decision. [ECF 13-1, pp. 248-49]. In its view, because testimony from an "unknown and unidentified woman who did not witness the crime" "would have no probability of affecting the outcome of the proceedings[,]" trial counsel probably made a strategic decision. [ECF 13-1, pp. 248-50]. Second, the State argued the testimony would not be helpful to the defense:

> Even arguendo had counsel found this person, her testimony would not have exonerated Defendant. If all she saw was the van but did not think anything was going on, this testimony would have been of little help to the defense case. A person telling her something and her continuing to walk to the kitchen does not exonerate the Defendant. Moreover, Defendant failed to tell the Court of this anonymous "witness" and the record does not reflect that he told his attorney to find this woman. Lastly, the victim clearly saw the Defendant at the time of the crime and made a one hundred percent positive identification of Defendant at the "show-up" procedure and at trial.

[ECF 13-1, pp. 250-51] (internal citations omitted).

23

After reviewing the instant claim under § 2254(d), it cannot be said that the state courts reached a result that was contrary to or an unreasonable application of clearly established federal law.

Consistent with the State's last argument, it was speculative to assume this potential witness would have testified favorably or stated anything helpful at trial. [ECF 13-1, pp. 250-51]. Based on the victim's deposition and other record evidence, this witness never claimed to have observed the physical features of any of the suspects because she walked away believing the victim was with his friends. Further, while the victim stated at trial that it was "pretty dark out" that night, he saw Petitioner because of the lights within the vehicle. [ECF 16-1, pp. 243-44, 266].

Just as the State reasoned, the victim was sure that he positively identified the two suspects who held him at gunpoint. [ECF 16-1, pp. 253-54]. The suspect who tapped on his window no longer wore his jacket, but it was the same black male with long dreads. [ECF 16-1, p. 254]. The other suspect, who entered the victim's vehicle from the passenger side door and had short "twisties" in his hair, was still wearing clothing worn during the robbery. [ECF 16-1, pp. 246, 253-54]. Importantly, the victim identified the suspects approximately thirty minutes after the incident [ECF 16-1, pp. 246, 253-54], meaning his recollection of their physical characteristics was particularly fresh. Finally, the victim testified that he was "more focused" on the suspect that entered the vehicle from the passenger side door, who was Petitioner.

Given that context, a jury would have likely given substantial weight to the victim's positive identification of Petitioner. A reasonable probability of a different outcome was not shown. *Strickland*, 466 U.S. at 694. The state courts' analysis on the prejudice prong was, therefore, not contrary to or an unreasonable application of clearly established federal law. Finally, this Court need not address the state courts' analysis of the deficiency prong. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1100 (11th Cir. 2007).

D. Ineffective Assistance Regarding Cross-Examination

In Ground Four, Petitioner submits his trial counsel was ineffective for not cross-examining the victim about inconsistent statements concerning his identification. [ECF 1, p. 11].

This claim was raised in Petitioner's final amended motion to vacate. [ECF 13-1, pp. 194-95]. In state court, Petitioner argued counsel's cross-examination of the victim was not thorough because there was no cross-examination regarding the green pants that Petitioner wore when he was arrested. [*Id.*]. From Petitioner's perspective, the victim's failure to describe the assailant as wearing green pants bolsters that he was falsely identified, as it is a distinguishable article of clothing.

The state trial court denied the claim by adopting and incorporating the legal reasoning contained in the State's Response to conclude Petitioner failed to meet either prong of the *Strickland* standard. [ECF 13-2, pp. 2-4]. The claim was raised

25

on appeal. [ECF 13-2, pp. 28-32]. Florida's Fourth District Court of Appeal affirmed in a *per curiam*, unreasoned opinion. [ECF 13-2, p. 78]. Thus, this claim is presumptively subject to § 2254(d)'s deferential standard of review. *See Richter*, 562 U.S. at 99-100. Because the last reasoned decision incorporated and adopted the state's legal reasoning to conclude that Petitioner did not meet either prong of *Strickland*, the State's reasoning at the state trial court level is presumably the basis for the state appellate court's affirmance. *See Wilson*, 138 S. Ct. at 1192-94.

Within its Response, the State argued that Petitioner's assertions were refuted by the record because Petitioner's counsel and counsel for Petitioner's co-defendant "extensively cross-examined the victim on the issue of identity." [ECF 13-1, p. 252]. In support, the State argued:

> [C]ounsel cross-examined the victim regarding the complexion of the Defendant and whether the victim had said Defendant's skin was light or lighter in the past. Further, counsel repeatedly questioned the victim concerning the circumstances surrounding the identification made at the show-up. It should be noted, as to the show-up identification of [Petitioner], which was made approximately thirty (30) minutes after the crime was committed, the victim stated he was one hundred percent positive that it was [Petitioner] who robbed him at gunpoint. Moreover, during his trial testimony, the victim once again made a one hundred percent positive in court identification of [Petitioner]. No amount of further cross examination by counsel was going to shake the victim's certain identification of [Petitioner]. There just was nothing left to cross examine him on.

[ECF 13-1, p. 252] (internal citations omitted). As for the color of the assailant's pants, "the victim never mentioned anything about the Defendant's pants in any of the attachments to Defendant's instant motion or during his trial testimony." [*Id*. pp. 252-53]. The State further asserted that Petitioner's argument on the color of his pants did not prejudice Petitioner because "the victim was concentrating on [Petitioner's] face and the gun rather than [Petitioner's] pants." [ECF 13-1, p. 253]. The victim had testified he was "more focused" on Petitioner because he did "most of the talking" during the robbery. [ECF 13-1, p. 253] (referencing [ECF 16-1, p. 261]).

Consistent with the State's argument, as the victim was "focused" on Petitioner's face, the jury would have likely disregarded any omission regarding the color of the assailant's pants. Moreover, Petitioner fled on foot after the minivan crashed, and the victim's keys were found in that minivan, which provided the jury with further evidence of Petitioner's involvement in the robbery. Viewed through the lens of § 2254(d), the state courts' prejudice analysis was not contrary to or an unreasonable application of clearly established federal law, as it does not appear there was a reasonable possibility of a different outcome. *Strickland*, 466 U.S. at 694.

With respect to the deficiency prong, the Court need not address it. *See Dingle*, 480 F.3d at 1100.

## IX. Evidentiary Hearing

In this case, the state record provides all pertinent facts. An evidentiary hearing in federal court is not needed. *See Schiro v. Landrigan*, 550 U.S. 465, 474 (2007) ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). *See also* 28 U.S.C. § 2254(e)(2) (stating federal courts "shall *not* hold an evidentiary hearing" "unless the application shows" circumstances that are inapplicable to the instant Petition) (emphasis added).

## X. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell,* 556 U.S. 180 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would

find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After careful consideration of the record, this Court should not issue a certificate of appealability. If Petitioner disagrees, he may bring his argument to the attention of the District Judge in objections.

### XI. Recommendations and Conclusions

Based upon the foregoing it is recommended that:

1.      the Petition be DENIED [ECF 1];

2.      an evidentiary hearing be DENIED;

3.      a certificate of appealability NOT ISSUE; and

4.      the case CLOSED.

Objections to this report may be filed with the District Judge within fourteen (14) days of receipt of a copy of the report. Failure to file timely objections shall bar petitioner from a *de novo* determination by the District Judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge, except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

Signed this 4th day of September, 2019.


_____
UNITED STATES MAGISTRATE JUDGE


cc:   Rodrick Johnson
      L52319
      South Bay Correctional Facility
      Inmate Mail/Parcels
      600 U S Highway 27 South
      South Bay, FL 33493-2233
      PRO SE

      Heidi L. Bettendorf
      Attorney General's Office
      1515 N Flagler Drive
      Suite 900
      West Palm Beach, FL 33401-3432
      561-837-5000
      Fax: 837-5099
      Email: CrimAppWPB@MyFloridaLegal.com


      Noticing 2254 SAG Broward and North
      Email: CrimAppWPB@MyFloridaLegal.com